and we'll call our next case Wharton versus Danburg. Okay, Mr. Hampton. How much time do we have? Could you pull the microphone? The answer to that is if you want four minutes, you can have four minutes for rebuttal. Go ahead. Your Honor, this is a case in which the position of the appellants is that the way that the case in Delaware that many inmates are being over-detained, and by over-detained we mean being held past the day that a court ordered them to be released. And in fact, I remember they held past that day. In some cases, they're held weeks past that day. Mr. Hampton, you took one deposition in this case, correct? That's correct, Your Honor. Of Ms. McBride. And she recounted numerous ways in which she took steps to mitigate the over-detention problem, reacting to complaints, et cetera, et cetera. What is there in the record that counters what she did and would allow us to find that she was deliberately indifferent? Your Honor, the problem, I believe, with what she did is that she said, I tried different things, but there is no proof that any of them were effectual. Well, what's the proof that there wasn't? There's a burden on your part to show that they were ineffectual and that she was deliberately indifferent. Your Honor, the individuals that we have listed as our plaintiffs and also as the additional inmates who were over-detained, we've listed them, and they went on for several years, and there's been no evidence that that has been corrected. I made a summary in a chart of the named plaintiffs, and really it came down to six of them were conceded by her to have been cause problems and error. Many of them were problems with just paperwork snafus in the courts or things that they really weren't over-detained. So I guess I'm trying to find the policy, the custom, whatever it was that you say is at the heart of this to show deliberate indifference on her part. Your Honor, if I may, the deliberate indifference on her part, I believe, can be examined and thought of in several ways. First of all is that she has not, despite the fact that she's known about these over-detentions, taken any steps to quantify them or any steps to quantify whether anything she did decreased the number of them. In fact, she said that she didn't even know how many complaints their office was getting about people who had been over-detained because she didn't keep those records. Part of the problem is the only cases that ever got to her were if somebody who was a subordinate brought the problem to her. How do we understand from your briefing, of course, and the record that you've provided us, that there are problems. But how are we to reach the point you want us to reach, which is the deliberate indifference point, right? I mean, we've got Moore v. Tartler where the court, quoting the district court in that case, said that an investigation, however slow and incompetent, was conducted. It may not work just the way you want, it may not be as effective or as efficient as you want, but there was activity, which appears to be good faith activity, to get improvement. In fact, the whole purpose for instituting CORE was to get an improvement. How can that be squared with deliberate indifference? Your Honor, first of all, the reason for CORE was to have uniformity. It was not to improve performance. Rather than to make sure that we're all on the same page, it was to improve speed. I thought from the press release or the press interview that Commissioner Danburk had that one of the main reasons to have CORE in place was because you had people being released too soon and you had people, in some instances, being held too long, and they wanted to eliminate that. Wasn't that the character tenor of his remarks? Actually, Your Honor, I think it's a little more complex. What was happening is because the individuals were being released by the various institutions, what you had was different standards and different policies in each individual institution. So the purpose of the uniformity was to make it operate more consistently, better than it had when people were just going off and doing things without coordination and letting people out too soon or holding them too late. That wasn't the driver behind this? It was consistency as opposed to speed. That's what I'm trying to get at. Because he did, but he put all of the releases that used to be held at the individual facilities into one place. Well, they weren't trying to make it consistently bad, right? They were trying to make it consistent in the sense of making it consistently right, correct. That is, you get out on the day you're supposed to get out. You don't get out early and you don't get out late. You get out on the day you're supposed to get out. I mean, I'm surprised to hear you pushing back on that because I thought that was sort of a point of agreement that they were trying to hit the mark and not undershoot or overshoot. You're disagreeing with that? Well, Your Honor, in the press release itself, the problem that was being addressed was the early releases. That was a problem that was bringing heat on the Department of Corrections because we were, I don't know, it was 19 or whatever the number was. So what they were concerned about primarily was the people that were being released too early. And part of that has to do with, I suppose, the skill and the training of the people doing the releasing and whether they actually looked at the background and looked at all of the appropriate computer sites. But the real question here is how do you get to the genuine dispute that you need to defeat summary judgment on this deliberate indifference issue if when you look at Montanez and you say was the action, sorry, that they took only ineffectual action. In point of fact, there were many actions taken. There's nothing in the record about them being severely ineffectual. You know, when you look at the total number of people being released, if it comes down to six people based on the evidence that Judge Rendell's question asked, or 37, whatever the exact number is, that's probably less than 1%. So how do we, what is there for the genuine dispute? First of all, Your Honor, on the people that were over-detained, there are maybe five or six of them in which it was admitted by Rebecca McBride that it was clearly nothing but a problem with the central offender records. However, there were problems in all of the other cases, and a number of them her answer was, well, we couldn't find the document that the courts should have sent us, so therefore we assume it's a problem in the court. We had the cases in which people, maybe it was a problem in the court, but it went weeks and days and days and days without anybody being able to address that because the inmates cannot tell anybody who has the authority to look it up. So we have inmates sitting in prison, their families are calling, the jail bondsmen are calling,  but they can't pull central offender records, which is the only people that can fix it. Is that, by the way, has, and this is maybe slightly off the legal topic, but I'm curious to know, has this lawsuit resulted in any change in that problem, do you know? To my knowledge, it has not, Your Honor. And I would point out that in several of the cases that were mentioned, I think in the Barnes case and in the Williams and Mortimer v. Baca, the 594th, 33rd, and 714th cases in 2010, in both of those cases, the court pointed out all of the corrective activities that both departments of correction took and how they actually greatly reduced the number of people being over-detained. In this case, we have no evidence, first of all, that they ever quantified how many people were being over-detained, and second, that they took any steps that actually reduced that number. Can I ask you a question about that issue? In the joint appendix at 779, there are erroneous release figures for the years in question. I don't know whether, and early and held past, et cetera, I don't know whether these are, I mean, they're in evidence, but are these just from the prison's viewpoint and you dispute them, or what? Your Honor, what was produced by Rebecca McBride, however, when you questioned, she said the only overly-intensive that she was aware of was in front of her subordinates, as far as her attention. In fact, when we looked through the records, starting with Mr. Wharton, there were quite a few people that she never knew were over-detained. Well, but it is a supervisor liability, and it has to do with what she did know. Well, she knew people were being over-detained, but she didn't have her subordinates tell her that people were being over-detained. Did she have a policy of not permitting people to tell her? Is that what you're saying? Well, the policy was they should tell me, but they don't. Okay, well, but that's not a policy that they shouldn't tell her. Which policy are you actually complaining about? Is it the cell phone policy, or is it a policy of how she was dealing? What policy did she adopt that you're complaining about? Well, I mean, part of the problem that she faces isn't necessarily her policy. It's just because there's reduced hours and there's reduced... Well, and there's 16,000 or 27,000, or just a lot of releases going on. Well, that's from here. Yeah, exactly. That's a lot per day. Are you actually saying, because they're open seven days a week, they're open on hours that take you late into the night, is the plaintiff's position that unless the court operates 24-7, there's deliberate indifference? In this case, I believe there is, and I would point to the Barnes case. In the Barnes case, one of the reasons that the court held the Department of Corrections at fault was they had a rule where at 10 o'clock at night, nobody could be released until 5 or 7 the next morning. It was an arbitrary rule. And they said, you can't do that because you're now keeping people who should have been released from being released. But there was a lot of discovery, and there was an expert report extrapolating exactly what was going on. I mean, here you have one deposition, and you make a reference to being stonewalled or something in terms of discovery. Did you go to the district court and say, I need more discovery, and ask the court to order it for you? I did not, Your Honor. I pointed out to the Department of Corrections my feeling, but I did not go to the district court. I did produce affidavits by people working in the system, both an employee, a bail bond person, a public defender, and depositions of one of the other people who worked in the department. So a deposition of somebody else who worked in the department. So the deposition wasn't taken purely for this case, but it was a deposition about these issues. The lady's name was Tara. I'm forgetting her last name, but it's in the appendix. So there is more than just McBride's deposition. There's also some depositions from other people who had other things to say about the department. Right. There's some affidavits. Okay. Thank you very much, Mr. Hampton. Mr. McTaggart. Good morning, Your Honor. I'm from the District Court. Michael McTaggart. I'm a law defense justice. I represent the counties in this case. I'll start first with the delivery of different claims. Even before you do that, let me ask you this. Do we even have to look at class certification here? If the court is correct about deliberate indifference, is class certification a moot point? I believe it is, Your Honor. I believe it is, and I think we cite it occasionally.  So then let's do stick with deliberate indifference. Well, then let me ask you this question, though, before we go to some other stuff. So if the District Court is incorrect on the 14th Amendment analysis as it applies to pretrial detainees, can you likewise forego getting to class certification? Your Honor, we addressed that in our brief, and I think the biggest brief cites, too, a case called Betz v. Newcastle, which says that the standard is essentially the same for the 8th Amendment claim and the 14th Amendment claim. It's still the deliberate indifference standard on their sample. So even though the claims were not broken out by the District Court, Even though he didn't address it? It's the same thing. Okay. And I think it's the same result. And as I read the briefs by the appellant, the argument is either that Danburg was right because there was nothing, or that Danburg worked to set up this system to make things worse. And we believe that the District Court got it right. That's not borne out by the record. Well, let's do, I'm sorry, go ahead. If there's an increase, and so this is a question, not a proposition, but if there were an increase in the over-detentions since 2008, wouldn't that by definition mean that the action taken was ineffectual? You know, I wouldn't necessarily agree with that. I think we still would have to go through the sample test and whether or not the actions of the specific supervisor, the policy of the supervisor, what the supervisor did, and then whether or not there was a parallel connection between the specific policy identified and whether or not that policy causally injured the specific plaintiff. These claims are very vague. They're hard to follow in terms of what the policy was. Well, they may be hard to follow in terms of what maybe a specific policy here or there is, but I understand them to be saying CORE doesn't work. It just doesn't work. And not only does it not work, it infects other things, that the state points to the courts and blames the courts for the problems, but it's still CORE's got an influence and an infection, so to speak, throughout the system, and here are all the ways we can point to it. We've got a CORE employee, Tara Stewart, saying they're short-staffed and so their delays in release are regular. We've got an affidavit from another CORE employee saying about 10% to 20% of release orders are not processed on the day they're supposed to. You've got the affidavit of the bail bondsman, Booney Mercado, who says the post bond and 25% of the people are held for more than 48 hours afterwards. You've got the public defender, Sandra Dean, who says it's gotten a lot worse since CORE. I won't keep going, but you get the tenor, and then you get the defendant, McBride, who acknowledges that there have been problems since implementing CORE. So if you take that record and you see it coming from multiple sources, and by the way, I didn't see any of that record from the state saying, oh, those people are all wrong, or it's really not the case that Mr. Mercado has got a quarter of his clients being held 48 hours longer than they're supposed to. If that's actually the record that it's hitting somewhere between a fifth and a quarter of people based on the CORE employee and the bail bondsman, wouldn't that suggest that the state's got a significant problem? No, Your Honor. We did address those affidavits in the brief. I mean, I think there are some issues with the specifics in those affidavits. For example, the one from the bail bondsman talks about when he posts bail. It's a collected affidavit, how his office operates. So you think there were fact issues? I think there are fact issues. Then shouldn't you lose summary judgment? No, Your Honor. The bail's posted at the court. I mean, I think he's entitled to reasonable inferences, but that's not a reasonable inference that every time bail's posted at the court, that that's a delay that's attributable to the Department of Corrections. Help me on something more fundamental. If there are fact issues, then why don't you lose? Your Honor, I still, as the district court analyzed this, on the deliberate indifference, there was not evidence of deliberate indifference by either one of these defendants. And these same arguments were made in the district court. But here's the problem, right? And tell me if this proposition is wrong, but if the number of overdetentions has increased over time and the plaintiff submits what they submit, and we can argue about whether they should be more fulsome, detailed, whatever, but it's there, why isn't that enough to create a genuine dispute of material fact? Your Honor, I don't believe that the numbers have increased over time. I think the numbers that are in the record… What's in the record? Tell me. The record that we have from Brian is about five people that have been overdosing over the course of discovery in this case. Okay. We have about 44,000 releases. Okay, so fine, five. Certainly what the plaintiff has put forward would lead one to conclude concretely that it's got to be more than five, right? I mean, there are, whatever the number of affiants are, it's certainly not just a couple, each of whom are referring to instances, multiple instances, many of them, where there are overdetentions. So clearly, at least the facts presented in the district court are in stark contrast to each other. Why aren't we mandated to just say, you know what, it's got to go back and it's got to be tried? Your Honor, I still would say, under sample of evidence, that the plaintiff still has to prove that there was some specific policy that was enacted by these supervisors, and that the supervisors were deliberately indifferent as to the use of that policy, and the enforcement of that policy causally injured these individuals. And when you look at the... That's the whole, that's the tenor of the question I guess you're getting from us, which is, is causality really so clear that there's no dispute of fact? You say, it's only five people. When you parse this out, look, it's only five people.  You say that 10 to 20 percent from your own core employees, 25 percent from a bail bondsman, some substantial increase not defined by a public defender, are being overdetained. We've got people that say that, and we've got your evidence that says something different. Are those factual disputes? And if they're factual disputes, do they need to be sussed out in a trial? Or can it really be the case that we can look at the record and say, even if you accept what the plaintiff's evidence is, it's not deliberate indifference? I don't think they're factual disputes. I mean, the record that was submitted by the plaintiff, we asked the plaintiff to give us the names of everybody that was overdetained. Who do you have? And we got the list of this. First it was 37. Then there were 14 more that were identified at the very end of discovery. But there may be a class. I mean, there may be a class of people. They don't have to bring everybody in. I mean, I pointed to this JA-779. Is this your view of who was detained? I mean, some of it is lacking in credibility, it seems to me. Two people in 2011 were held past the release date out of 13,435. Is that your contention, that that's how many people? I believe that's what was reported by the department. And then there was 18 in 2000 out of 27,000. Two people in 2009 out of 21,000. It doesn't seem to square with the plaintiff's evidence. Well, Your Honor, the argument that was made in the briefs was that the Amber and the Clyde did not, I mean, actually the record doesn't show that. I mean, they did take affirmative steps here. Why don't you tell us about that? Why don't you explain what was done to address the problems? It's in the record. It's in the record, yeah. The steps that Amber took were to organize the central kind of records in one central office. We don't agree with the record that's... Well, that can't be the step, right? Because the argument is, CORE made it worse, not better. So we start with CORE. We don't say CORE is the step that made it better. CORE is, according to them, the problem. So you can't advance the ball by playing to CORE. So what do you got after the establishment of CORE? After the establishment of CORE, McBride also, they started having a formal training program for everyone who worked there for six months. The hours of the office are from 5 in the morning until 10 at night. They stay up 24-7 with supervisors. What of the argument that they won't answer the phone? That we've got affidavits and testimony from people saying they will not answer the phone? They may be open, but nobody knows it because you're stuck at voicemail hell because they won't answer the phone. I think there's a dispute of fact on that, Your Honor. McBride testified that they do answer the phone, but I think that's a dispute of fact. Okay, so is that a material dispute of fact? No, I don't think it is. If they're open, but they're not taking phone calls and people can't get answers, is that immaterial to the question of whether people are deliberately indifferent? It's immaterial to whether or not somebody answers the phone. I think that's a two-separate question. A two-separate question. Suppose the testimony was there are five people, each of whom has called on multiple occasions at different times of day and night, and no one ever answers the phone. Is that a material fact that creates a genuine dispute? I still would say there has to be some showing that there's some harm there. But if somebody called, and then that's the delay that led to someone not being released on time... Well, the harm is that each of these people in my hypothetical have said that the inability to have the phone answered led to over-detention. That's essentially what's happening. Maybe not with the exactitude of the hypothetical, but that's what's happening. That there's five people that... No, no, that the allegation is that every time we try to get some help to extricate ourselves from the system, the system is set up in such a way that it doesn't permit it. Well, at the moment, the only thing we're trying to figure out is whether it creates a genuine dispute, which requires us to send it back. What would create a genuine dispute in your view? There can't be speculative evidence about who the plaintiffs are. There has to be evidence about who's in the class. And I don't think these affidavits support who's in the class. The one is an estimate about who might be in over-detention. When you say... So you're shifting grounds now to the class certification point? I mean, the question we're trying to... The question we're trying to get you to grapple with is they have brought forth evidence from people prepared to say the system isn't working and it's not working for an appreciable number of people. 20%, 15%, that's a lot of people when you're processing tens of thousands. A quarter, that's a lot of people. That's their assertion. They say we've got a class of people ready to come in. Chief Judge Stark said, no, there's no deliberate indifference here because they were trying to address problems. They knew they had problems. They were trying to address it. So you could win on that basis if you could point to the record and say, here's why he's right. Here's the things that they're doing that show they weren't deliberately indifferent to the problems. So what were the things they were doing? And you've mentioned that they had training. What else you got? There was also testimony about they established a bail unit in 2013 where these bails were handled in a more expedited manner to improve releases. They have made changes to the computer system to improve the release process. That's in the record. I'm sorry, that's in the record. It's all in McBride's reposition. Staffing on the weekends, during the week. Those are changes in staffing, increased staffing. The overall staffing for the facility, for the office, yes. They went from being short-staffed to being full-staffed. Well, staffing has been added during the course of the operation. Casual seasonals have been added. The office has been trained to treat all releases as a priority. They've been trained to report overdetention each day. It's not as if McBride burned her head in the sand here. Since older people don't tell me anything about anybody who's overreleased. And we have a large... Well, let me ask this. Your time's up, but if my colleagues will indulge me, I want to ask you the question that I asked Mr. Hampton. Since this lawsuit has been filed, has there been anything that's changed to address things like nobody answers the phone, et cetera? No, the one change has been the bail unit that's been established in 2013, which expedites the way these... When someone's bail is changed from secured to unsecured, or if somebody's charged or not on cross, it's done in a more expedited fashion. But it moves away from the so-called 24-hour rule and I think it's done in a quicker fashion. As far as not answering the phone is a disputed fact, but certainly anybody can break essential kind of records. And that's in the record. McBride testified that once you get something, the registry investigates it. Okay, thank you, Mr. McTaggart. Mr. Hampton, your rebuttal, please. Thank you, Your Honor. The slate to the transcript of 904 is the official rules by the COR that specifically says offenders are not to contact central offender records, they are to contact their counselors. And that is part of the problem that existed in the beginning and has not been fixed. In my reply brief, page and a half, I think 7 through about 11, I went through and specifically pointed out what everybody told me was a problem when they were trying to get their situation fixed. And some of these people were in there for weeks and months and they were told things like nothing came up on the computer, status didn't change on the computer, they don't have any paperwork, they have 72 hours before we have to release you. These are the answers that people are getting when they're incarcerated. Because these answers haven't changed, you have the same situation that whether it is specifically a problem completely internal to COR or whether it's a problem that could be fixed, the COR addressed it, the inmates themselves have no way to get this problem out to anyone unless the particular counselors or correctional officers want to make a call. In fact, some of the incidents we went through with Rebecca McBride when we were going through the records, the reason that the person eventually got out is because COR started getting calls from the prison or from the court or from somebody outside saying why isn't this person out? And those calls were days and even a week down the line. A system where the only way the inmate himself can tell anybody of being wrongfully held here is to try to write a letter to COR. They don't know how many letters they get, they don't know how many of them are complaining about being over-retained. So what should be done? Part of what should be done, I can't say exactly what they did at Barnes and Morton were great, but they list at least five different things in the one case that they did. Things like tracking these releases to see how often they got out. Making sure there's somebody who can actually respond if the inmate says I was in court today and the judge released me, but here I am. And two or three days later, here I am, here I am, here I am. That's a perfectly valid, sensible point. Now, the question that we have to wrestle with is deliberate indifference, right? Because Chief Judge Stark looks at this evidence and he says, given the number of releases handled by COR each year, it is unsurprising, though of course unfortunate, that errors occur in the prisonership sometimes over-detained. Some instance of over-detention occurred is not sufficient by itself to show that McBride was deliberately indifferent to such incidents to the contrary McBride demonstrated throughout her deposition. She's familiar with the procedures and quote, was actively working to improve processes. So that's a determination that the district court made looking at the record saying she's doing something. It may not be what you want. It may not target the things you'd like to have fixed. It may not address that with the specificity you want. But we're dealing with a blunt instrument here in terms of constitutional violations. We don't get to fine tune things. We can only say when there's a really bad out of whack thing happening then we get ourselves into it. I take to Chief Judge Stark's remark to be you're not there. You haven't built the record to show that you're there. You have fine tuning complaints but that's it. How is he wrong? I think, Your Honor, I would disagree with him in that they know these over-detentions are occurring and there's other case law that says if you know there are over-detentions occurring and you know you're the one that's going to have to fix it and you don't do anything that's effectual, that's indifference. That's deliberate indifference. I would point out that even when Amber was being questioned way back, we admitted that that transition has created more confusion. Sure, any transition. Any transition will create confusion. When you say they haven't done anything, respond to Mr. McTaggart's assertion that they created a bail unit. A bail unit specifically to address speeding up bail release. So that doesn't count as anything? Well, there's no evidence that it did. Number one, there's no evidence that it did. Number two, it's not going to fix the problem where the person's in the prison and they can't get out because somehow the records didn't get to COR or COR1. But that is a problem, but that's inherent in any situation where you have the court, you've got different things, and stuff falls through the cracks. I mean, you have that, you know, with defendants supposed to be delivered for trial and something happens and everybody struggles to figure it out, but is that an issue of deliberate indifference? I guess that's the question. That's what we've got to fight with, right? I'm sorry? I said that's what we've got to fight with, right? It's certainly not ideal. Nobody in this room, even Mr. McTaggart doing his utmost for his client, I'm sure nobody in this room would say the system is functioning flawlessly. The question is, is it functioning in a way that could be said to represent deliberate indifference on the part of the state of Delaware? And we've got your, we have your argument on that. Let me finish by just suggesting that I hope the state is at least paying attention. You know, it may not be that legal remedies flow, or maybe they will, you know? Maybe we'll get together and say, yeah, deliberate indifference. But however that happens, whether it happens or not, I hope the state is paying attention and that instead of just saying, well, we think we do answer the phone, somebody's actually paying attention to these things and addressing them. That would take some pressure off probably, right? Okay. Well, thanks for a well-argued case, and we appreciate both parties' assistance with it. We'll take the matter under advisement, and we'll stand in recess until tomorrow.